This video was made in Cooperation with Shizuoka Prefecture Tourism Promotion Division.  This video was made in Cooperation with Shizuoka Prefecture Tourism Promotion Division. This video was made in Cooperation with Shizuoka Prefecture Tourism Promotion Division.  This video was made in Cooperation with Shizuoka Prefecture Tourism Promotion Division. This video was made in Cooperation with Shizuoka Prefecture Tourism Promotion Division. Am I understanding the statute and the FDA regulations to mean that the adverse judgment on the 599 turned the paragraph 4 certification into a paragraph 3 certification? Does that mean that Milan no longer lawfully maintains a paragraph 4 certification for the 599? You're correct on both counts, Your Honor. So without the 703, they would have no exclusivity? Is that a contested answer that you just gave? I don't believe it is. Your Honor, the fundamental error that the district court made is in assuming that as soon as the 703 patent is disclaimed, that the private owner had any interest in it and that that patent was dead. In fact, that patent is not dead in the eyes of the Hatch-Waxman and FDA because it continues to be listed in the FDA Orange Book. The consequence of it being listed in the FDA Orange Book is this. When Apotex filed its ANDA with a paragraph 4 certification to the 703 patent, that constituted a technical act of infringement under 35 U.S.C. 271E2. Just because that patent continued to be listed, as a result of that, we're in the position of being an infringer, and of course, Daiichi is the patentee. So there is adversity there. So what's the nature of the injury that Apotex is trying to redress here? So Apotex is trying to redress an economic injury. In other words, if we're able to get our judgment on the 703 patent that is not infringed, we would be eligible to go to market on day one of generic SEC. So you're no beef with the 599 patent? Right now, I have no beef with the 599 patent, Your Honor. Does that trigger the statutory procedure that's going to undermine the 180 days? We want to utilize the statute to cause forfeiture of the 180 days. It depends on, you can phrase it. Right, trigger forfeiture, right, I understand. We can do semantics. But the real point is this. Because if you're successful at this stage in the game, you're likely to get your district court judgment, the final judgment, more than 75 days before the expiration of the 599, right? Correct, Your Honor. So there's really nothing that my land can do to save itself. That's correct. And that's what the... But your argument is that condition is created by the statute, not by your behavior. Exactly. That's the intended result here. The forfeiture would not be triggered, I assume you agree, if you never have tentative approval? If we never get tentative approval. It's just that your position is you don't need it at the beginning of the declaratory judgment process. That's correct, Your Honor. And is it part of our inquiry, or should it be a question that the district court did not look at, which is, as a factual matter, how likely or unlikely is it that you will get your tentative approval? Because my understanding is that in some Article III case or controversy context, there is, I think, even Supreme Court authority for making a factual inquiry into the degree of contingency, to use a shorthand. Your Honor, I think in cases, these Hatch-Waxman type cases, where the applicant has actually fouled the ANDA, the train is on the tracks, they're seeking regulatory approval, and they're expected to get it in due course, and FDA is supposed to give it to them in due course, unless there's some significant problem with the application. But there certainly are some cases in perhaps different contexts, maybe suits against the FDA, a Teva suit maybe in the District of Columbia a few years ago, that found the absence of tentative approval to count against standing. Not quite the same here, but sometimes that has been a basis for finding no standing. That's correct, Your Honor. Have any of our cases, either in the Hatch-Waxman, ANDA context, regardless of which side initiates the action, spoken about the role of tentative approval or its absence? I don't believe so, Your Honor. And in fact, as we said in the brief, we demonstrated in the brief that in several of the cases, at the time that the applicant filed this action, the D.J. action, they didn't have tentative approval. Well, there's no assurance that your client will get tentative approval, and there's no assurance that your client would come to market if they had tentative approval. Things can change. Your client can be acquired by someone who has a different view. So what I'm getting at is whether or not the absence of tentative approval here somehow informs the ripeness inquiry. Ripeness is part of, I believe, under meta-immune or assessment of whether or not there's already complete jurisdiction at this moment in time. Sir, let me answer it this way. First of all, under the declaratory judgment part of the statute, which is 355J5C, it says nothing about tentative approval. So having tentative approval is not a prerequisite to filing the D.J. action. Can you address my concern? I'm wondering whether or not there aren't ripeness considerations here, given the fact that you don't have the tentative approval. Because the effect of what's going to happen once you have tentative approval is pretty severe. It's going to wipe out 108 exclusivity that was fairly earned by Monland in your event, right? Correct. And the Congress intended, they didn't intend to get rid of the 180 exclusivity period with the 2003 amendments. That's true. They intended to leave a situation where the holder of the 180 days would have an option to be able to save the 180 days by coming to market within 75 days. But in the mixture, in the facts of this case, Monland is helpless, totally helpless. It's 180, so they will be eradicated if the case goes forward. And at the same time, we have some possible residual doubt as to whether your client will get tentative approval. Why doesn't that inform, if not elevate, ripeness considerations here? Well, to address your concern about Mylan, if we don't get tentative approval, they're not going to forfeit their 180 days. The way the statute is directed is that only— I know, but there's no way for them to save themselves. Getting to market within 75 days was a way of Congress saying, oh, well, if somebody does go out and get a judgment that pulls the pins out from underneath you, if you hurry up and go to market, you get to keep your 180 days. So to me, that's a way of Congress saying we are still giving lots of weight in the order of things to the gift, if you will, the earning of the 180 days. Right, so the 180 days is not a gift. It's not an earning. They're eligible for it, but they don't have it until they can go to market. And the point of the statute is to reward someone who can get to market early. And the reason Mylan can't get to market early here, and the reason I don't feel bad for them, is that they lost on the 599 patent. So had they won on the 599 patent, they'd already be on the market. We're talking about that moment in time when the 599 is gone. No one is harmed by the 599 in the terms of this lawsuit. Correct, but the other thing that they could have done is that they could have brought a declaratory judgment action on the 703 patent and gotten the judgment. How could they have done that? I mean, it was disclaimed by Daiichi. How would there have been a case of controversy? Daiichi, having disclaimed it, could not assert it, so they were under no threat of enforcement. And the only effect of their bringing the declaratory judgment action on the 703 would be to harm their half of the duopoly profits for 180 days, right? So how could they have a case of controversy against Daiichi to bring the 703 action? I think you have to go back to the purpose of the MMA amendment and Congress's recognition that there are certain patents out there that are not strong. And in particular, a disclaimed patent is among the weakest types of patents. And what Congress wanted to have happen is to allow parties to bring declaratory judgments to get the declaration that these patents are invalid or not. I understand the point that if there were no 703, Congress did not, this is my first question, did not want them to have an exclusivity period. They get it only if they have some measure of success, not if they simply lose on the only patent at issue. That's why I thought that that was important. I don't understand how they could have brought a 703 DJ action against Daiichi after the disclaimer because it could only have harmed them. Well, it would have eliminated the 703 patent's ability to exclude. Can I just ask one other question? And I know you're into your remittal. If this went to the merits in the district court on your DJ action, is that over in a second because a disclaimed patent can't be infringed? Correct, Your Honor. You said you wanted to save ten minutes. I'll reserve ten minutes. Thank you, Your Honor. Mr. Conde. Yes, Your Honor. You're from Daiichi. I am, Your Honor. I'm from Daiichi. We'll be splitting up our time ten minutes each. I'll be covering basically the Janssen issues and the disclaimer, the effect of those on jurisdiction. And my colleagues from Milan with regard to jurisdictional issues will deal with the tentative approval aspects of it. So this case is squarely within Janssen. In Janssen, we had two factors. One, the generic acquiesce to the first of the earlier to expire listed patent. And two, the first filer's exclusivity was keeping Apotex off the market in Janssen. And what this court said is that the only thing that Apotex was trying to do was to trigger the 180 days, and that does not lead to a judiciable controversy. Right, and that little part of Janssen was about the statute before it was changed in 2003 to basically make forfeiture something, to set out all these forfeiture provisions. So this court has said in Dai and in Teba Viesai that the statute had no impact on the jurisdictional issues, and that even in the Dai case where... Was that exactly the language they used, or did they say that those old cases remain our guideposts for working through these problems? Well, they said it in various different ways. I just didn't recall it being said exactly the way you told it. Well, they said it three different ways. They said in Carrico it's inconsequential, I think, is the language. In Teba, I think, I mean, in the Dai, I think what the language was was that we look back to Janssen and Carrico as the most pertinent ones. And I think also in Dai they used a word basically like insubstantial, it makes no difference. So the precedent from this court has been that the MMA doesn't affect jurisdiction. The forfeiture provision itself has nothing to do with jurisdiction. The forfeiture provision simply changed the way that the 100 United States... It doesn't have anything to do with jurisdiction in some statutory sense of jurisdiction, but if the question is pure Article III case or controversy, our job is in part to figure out is do they stand to gain something. Now, if they can get into the market six months earlier than otherwise, a lot of money is going to be transferred from the two of you to them. That sounds like a really concrete stake unless there's an undue contingency or unless there is a statutory bar to their getting into the market. So the effect of the statute is relevant to the contingency question on the constitutional inquiry and that statute has changed. Your Honor, the change in the statute doesn't make a difference because before the statute there would be effect on the first file as well. You could eliminate the 180 days before the statute. In fact, it was easier before the MMA to trigger the 180 days. All you needed was a district court decision. Post-MMA, you need a non-appealable final decision from this court, basically. So what the Congress actually did is made the trigger more difficult. Do you agree, by the way, that in this case the merits litigation is over in a second because a disclaimed patent can't be infringed? Yes. A disclaimed patent can't be infringed and a disclaimed patent can't provide jurisdiction either. With regard to the forfeiture provisions, however, I think it's important to know that the care code, that the Janssen decision addressed the very thing that you were talking about, Your Honor, which is that in Janssen, if you recall, what the court said is that the reason there was no jurisdiction was that the generic caused their own problem.  And the only thing that was left was that they were challenging the 180 days of the first filer generic. And what the Sebelius case said, which was post-MMA, which was post-Janssen, said that Congress used the 180 days as the device to incentivize the first filer and that courts aren't allowed to amend or change that clause. And do you agree with the first question I asked, Mr. Feldman, that if there never had been a 703 patent that Milan would not have an exclusivity period having lost its litigation on the 599? That's correct. However, there is a 703 and when Milan filed the Paragraph 4 notice, both the 599 and the 703, at that point, they were the first filer for both patents. So in order to trigger the 180 days, you had to have a judgment not just on the 599, but also on the 703. And with regard to the so-called benefit to the plaintiff, the defendants in this case, the question isn't what happens to Milan and Giotto Sanchio if it's triggered. The question is whether Apetax is harmed. What is the harm to Apetax? And here, the argument is the harm is traceable to the fact that they acquiesced to the first patent and the harm is traceable to the fact that the FDA did not delist. None of the harm is traceable to any action by Giotto Sanchio. Except you're having put it in the orange book. We put it in the orange book, but we, of course, we disclaimed it and we requested the FDA to delist it. They are not suggesting, or let's stipulate that they're not suggesting that you were somehow acting wrongly in putting it in the orange book. But there's a lot of unjust enrichment law that says an action that was perfectly okay at the time is nevertheless litigable if it means that benefits are being retained that shouldn't be retained. This seems like something like that. Well, it's not because it doesn't take into consideration the position of Milan, who rightfully challenged the 703 patent, who rightfully obtained first file status as it. They challenged both. Milan challenged both the 599 and the 703. So the fact that we disclaimed the 703, when Milan filed... When you say challenged, you mean that they put a Paragraph 4 certification, they didn't litigate it. No, they did not litigate it, but they made a Paragraph 4, which is all that's required to get the 180 days is to make a Paragraph 4 certification on both patents. When that occurred, when they were the first one to occur, then it's Milan's right that that is the issue with regard to what you're talking about in terms of listing and delisting. That's the difference between this case and the other cases that you were referring to before. There's a component here that Congress has said that the 180 days is the incentive and that the courts are not allowed to disrupt that incentive. I wanted to briefly discuss the disclaimer issue. I think that there's been no court that said that you can bring suit on a disclaimed patent. You can't. I don't think that... I haven't heard Apotek say otherwise. Once the patent is disclaimed, then Daiichi Senkou could never assert that patent. The flip is correct as well, the corollary, that it cannot be the basis of a declaratory judgment action because it simply does not exist. Has anybody ever presented a case where, as a result of a statute, a statutory scheme that makes the existence of a judgment different, a distinctive event that allows entry into a market if that event occurs with presumably lots and lots of money at stake? It seems to me that the cases that you're talking about in the pure patent context just don't address the question. They don't count against it. There just was nothing else at stake. Here, there's a lot of money at stake. If they can get into the market earlier, that's a lot of money, and if not, then not. Your Honor, but that's an issue that Congress needs to address if it needs to be addressed at all. The MMA was revised because there were complaints about what was going on vis-à-vis parking. The MMA got amended, amended the Hatch-Waxman Act. If this is an issue, if the FDA refused to delist, and if the FDA does not delist it... If they already had tentative approval, would you have an argument that the suit cannot proceed? Yes, Your Honor. It would still be the same argument if they had tentative approval because what Janssen says is that you need to challenge both the 599 and the later expiring patents. It's not enough just to challenge the second patent because then all you're doing is challenging the 180 days you're trying to trigger that, and that's not enough. If the consequences here are going to be changed, I respectfully submit that these should be changed either by the FDA through the D.C. Circuit Court or changed by Congress. It's not for this Court to change the result that occurred here that's based on the statute itself. There's nothing in the statute that says that if you have a situation where we have here that a defendant, a second generic, should be able to file a D.J. There's nothing in the statute that would arise to that level in a given jurisdiction. Unless you have any other comments, I rest. Mr. Chomsky. Good morning, and may it please the Court. The preceding discussion makes clear that this case is all about my client Mylan's right to 180-day marketing exclusivity. Its six-month reward for opening the market to competition six years before the 703 patent would have allowed generics to enter, but for the initiative, the expense, and the effort that my client undertook to file a path-breaking paragraph IV certification to that patent. I respectfully submit that that gives Mylan a legally cognizable interest in the outcome of this case and that the District Court erred in refusing to allow Mylan to participate as a full party. Can you talk about the merits? I don't actually see at this point significant dispute about your right to intervene. You clearly have a lot of money at stake. Absolutely, and I appreciate that, Your Honor. By the merits, you know what I mean. I know exactly what you mean. The merits are actually jurisdiction in this case. I want to focus not so much on the line between Janssen and Carrico, although this case is on all fours with Janssen. There is a very important distinction between this case and the other cases that this Court has considered when it comes to the standing of the plaintiff in this case, the Declaratory Judgment Plaintiff Apothex, and that's that they lack tentative approval. And we think that makes this case different than all of the other prior cases. And it has two very important jurisdictional... Can I ask you a technical and maybe picayune thing? Am I right that there was a kind of oops moment in your brief when you quoted the statute with ellipses and put tentative approval before language, that you rearranged pieces of the statute in your quote without calling attention to that fact? Your Honor, I don't remember rearranging the words, but what I think you're pointing out is that there are two different sections in the forfeiture triggers. One that refers to a declaratory judgment action that is brought by another applicant, and then the provision that actually lays out the various things that can trigger the forfeiture in an action that is brought by another applicant. And those things include a court decision of invalidity or non-infringement by, quote unquote, any other applicant, which other applicant has obtained tentative approval. And so there is both the brought by clause, which I think you're correct, precedes, it's in the precatory section to the enumerated sub-provisions, and then there is the has obtained that follows that. And I think the statutory citation you might be looking for, it's subsection J5, capital D, little I, Roman I, and that's the precatory language that has the brought by. And then it's in little BB, and I think capital AA, that has the has obtained tentative approval. So we read those two sections together, that the action must be brought by any other applicant, which other applicant has obtained tentative approval. Suppose I were to read a statute  that has tentative approval at the outset of the declaratory judgment action, and indeed, even if this one were dismissed and they got tentative approval, I don't know, in May of 2016, they bring their DJ action, and I think the litigation over the non-infringement is over the next day, basically, because there's nothing to litigate, and an appeal would either be frivolous or maybe summarily affirmed. Do you agree with Daiichi's answer that regardless of all of that, they cannot bring this suit because you simply have a right to this exclusivity period, and even if they have tentative approval, they cannot bring the challenge, the almost self-evidently meritorious challenge, as to the 703? Yes, Your Honor, I agree with that, and I'd like to add two things to that. One, in those circumstances, we'd be on all fours with Janssen. Janssen's rationale would control, because Apotex chose not to challenge both of the listed patents. There's no jurisdiction over the case, even if they had tentative approval. With respect to the tentative approval point, there are really two things that I'd like to emphasize here. The first is that there's a time-of-filing rule for federal jurisdiction, so that if you subsequently meet whatever condition is required to secure federal jurisdiction, your case can't be revived. The jurisdiction needs to exist from the outset. Why would it make any difference if this suit went away, and the minute they got tentative approval, they bring a new suit? Perhaps they could refile, but remember, we have 75 days to launch after the final judgment. That's why I picked May 2016. Sure, so if it's May 2016, perhaps at that point they could refile, more on that in a moment, and then you might be in that hypothetical. But I want to highlight that the jurisdictional defect that exists today, the jurisdictional defect that existed the day the suit was filed, would not be cured by them subsequently obtaining tentative approval. That needs to be fixed independently. The second thing that I want to say is a little bit different. You were positing, I think, a situation in which you, and I know it's just a question, not what you were saying, but if the statute were... A positive is not a bad word, sure. You were positing an interpretation of the statute, which I think proceeds from the premise that the statute is ambiguous. The statute could require tentative approval to exist at the outset, the initial filing, or it could simply be read as requiring tentative approval to be obtained at some point later in time, prior to the entry of judgment. That ultimately is an issue that the FDA is going to have to resolve. And so it introduces another layer of uncertainty into the statutory interpretation here. I don't think that we have to decide that now. I don't think that you have to decide that right now, Your Honor. I think the fact that... Assume we decide that Janssen isn't dispositive. Assume we decide that all the prior case law is a bit like a square peg being jammed in a round window. And we're just looking at this question. I don't think that you need to decide that right now. And I have to say, I'm not sure what the effect of you deciding that right now is. Under Chevron, and there's a Supreme Court decision that deals with these issues called Brand X Internet Services, which was decided a few years ago, federal agencies that have authority to interpret their organic statute, which is the FDA questions de novo, even if a court gets to the question first and opines on it. In what kind of context is the FDA going to decide whether or not received tentative approval means before or after bringing the suit? Well, if this case were to proceed, if Apotex were to get the judgment it requests, then there would be a question in front of the FDA about what the consequence of that decision is. My client certainly would take the position that because they didn't have tentative approval at the time that judgment was entered, the statute isn't triggered. My clients also would have another argument, which we raise toward the end of our brief, which is based on the Teva versus Sebelius precedent, which you all referenced earlier in the argument. The FDA clearly is not going to trigger the 2003 amendment forfeiture proceedings until tentative approval is obtained. That's correct. And the agency also typically doesn't resolve exclusivity issues until a subsequent applicant is actually prepared to launch its product. So it would await the tentative approval. Apotex's point of view is it doesn't have to go back to the FDA. If it gets jurisdiction here and they get the automatic decision, then they just sit there and fold their hands and they say, my line can't get to the market in 75 days. The passage of time alone takes care of what they need. And your honor, I expect. And so why isn't all of that so? Why does the FDA have to get involved? Well, I think my clients would raise the statutory arguments that they've made in this case before the agency. And if they don't approve them, we retain a right to 180-day exclusivity. And I was saying a moment ago, we think the Teva v. Sebelius case from the D.C. Circuit is very important because that case said a brand manufacturer can't cause the first filer to lose its exclusivity by disclaiming or delisting a patent or ceasing to pay the maintenance fees. And so our view is this is really a contrived, a ginned up lawsuit to evade the Teva v. Sebelius case. What Apotex is saying is, well, we understand that Daiichi's disclaimer can't get rid of the exclusivity that Mylan currently enjoys, but we're now going to gin up a court decision that says what everybody on earth knows, which is that the Daiichi patent has been disclaimed and can't be asserted. And because it's not just Daiichi having disclaimed it, but a court saying that Daiichi disclaimed it, we can get around that case. And the consequence of that, of course, is to pervert the statutory reward that Congress delivered to clients who take the initiative like Mylan and open up the market six years early again. If Mylan hadn't filed its paragraph four to the 703 patent, no generic could enter until 2022. Because of Mylan's actions, the market opens in 2016. Apotex can enter if they ever get tentative approval. So if you had not filed the paragraph four certification, why should we assume that Daiichi would not, in October 2016, have disclaimed or just decided not to sue anybody making a generic? Perhaps they wouldn't have, Your Honor. So how do we know that your filing of that paragraph four certification moved the entry point back eight or nine years or whatever it was, six years or whatever it was you said? Your Honor, nobody can know for certain what Daiichi was thinking, but the timing of this, which was a patent that had been listed for years in the Orange Book being disclaimed upon receipt of Mylan's paragraph four certification suggests a causal link. But regardless of whether it was a causal link in fact or in theory, it's exactly what Congress wanted to encourage. If you're a generic and you stick your neck out at the risk of a patent infringement litigation to challenge a patent and you open the case, it's six months of exclusivity for six years of early generic competition. And I'd respectfully submit, I see my red light is on, that it would turn the statute upside down to take away Mylan's reward for having achieved so much for consumers. Thank you, Your Honors. Please. Aaron, let me just address Mr. Chumsey's last point there. It's a fundamental misunderstanding of what this 180-day exclusivity is post-MMA amendments. It is no longer a statutory entitlement. It is no longer just a reward for being the first to get your papers on file. We cited some legislative history that makes that abundantly clear. What it's a reward for is actually getting your product to market. And they haven't gotten their product to market. And the consequence of not getting your product to market is that you're subject to these potential forfeitures. People who can't, generics that can't get their products to market are subject to forfeiture. Because the ultimate purpose here- They can't get their product to market now. Right. Okay. So can you address the existence, if not technically, contrary to what the D.C. Circuit held in Sibelius? This is giving legal effect through a district court judgment that's there for the asking, if only there's jurisdiction, to the equivalent of Daiichi's delisting. Yes. And it's really the same point. In other words, the incentive structure for what brands are able to- Sibelius is post-MMA. Post-MMA. Correct. So how is this different from what the D.C. Circuit held was contemplated by the MMA? Sure. The district court said that a brand company cannot deprive the first generic of its exclusivity. But we're not the brand company. What we're doing is we're now operating under the statutes that's actually written for us, other applicants, other generic applicants, that creates basically a pathway for us to challenge those patents and to get these judgments. So the incentive structure there and what Congress is really looking to do is not just reward one generic over another generic. The real point of all this is to get these products in the hands of consumers as soon as possible because of the tremendous drop in price and the benefit that the consumers get. So what's going to happen is if there's one generic on the market, the price drops a little bit. But if you have multiple generic competition, which is what MMA amendments are really looking for, the price is going to drop 40%. So that takes benefits financially for sure, but the public benefits a lot more because these prices are going to drop. And that's the real point of these MMA amendments. In the legislative history, we cited to Senator Schumer and S15746. If you had written a paragraph 4 certification to cover both of the patents, 599 and 703, what would have happened? So we would be in litigation most likely over the 599 patent. But there's no guarantee we would have won that litigation in time for it to matter anyway. And suppose you filed a declaratory judgment action because they didn't sue you, they didn't take the initiative of doing that. And in that action, the district judge said, do you have anything to tell us that the earlier litigation on the 599 didn't fully consider and you say no? And the district judge says, well, I'm going to follow that judgment. Infringed, not invalid. I think I heard Counsel for Daiichi say that might present a quite different situation under the forfeiture provisions because you would have put in play all of the patents as opposed to only some. Can you address that? Including correcting what I just said, I thought I heard. So that is, I think, trying to apply some of the logic for Jansen and the fact that Jansen said you had to sort of attack both patents. But the distinction here is that the Davies-Novian case says, and the other case, and even the statute itself, forfeiture provisions is all that we have to attack is the patent that is the basis for the exclusivity to cause the forfeiture. And that patent right now is only the 703 patent. If I could move on to just address more fully the ripeness issue that Judge Clevenger raised. In our briefs, we cited two district court decisions that have expressly addressed that issue. And they expressly found that having tenant approval is not a prerequisite for us moving forward with this action. Without a whole lot of discussion. The rationale, I think, made sense. First is that our ANDA is fixed right now. The product, there is no dispute about what our product is. And don't forget, this is a patent infringement action at the end of the day. What's being decided here is do we infringe this patent or not. But the second point, which is I think the really most important point, is the practicalities of the situation, the timing issue. Even though this seems like a relatively simple thing, the fact is we brought our case in 2012. We're now in 2015. It takes a while, even for issues like this, to percolate through the court structure. And what Congress wanted to have happen is they wanted early resolutions of these patent disputes. And they didn't want to have a bottleneck where we had to wait for tenant approval before we bring it. Because, frankly, there's not enough time to get everything done. And, of course, under the new statute, as Mr. Connie points out, we not only need a district court judgment. At least in this case, if you're right about how trivially easy the patent merits litigation will be, where is the timing issue? Until you have tentative approval, I think you agree there's no forfeiture. So why not wait until you've got tentative approval, have your papers ready, refile, ask for, I don't know, TRO, emergency relief or something like that. They will have nothing to say in response to it, I gather. I mean, a disclaimed patent can't be infringed. I gather everybody is in agreement with that. And then you've got your forfeiture, don't you? Well, again, FDA will ultimately have to give us the approval. And as Mr. Chomsky pointed out, he's not going to sit still while the FDA gives us this approval. He's going to bring an action against the FDA to try to delay this as long as possible so that he can run the clock out on us and that they're going to get to market. He's going to bring his let's enforce some alias. Exactly. That's exactly what's going to happen. There's going to be yet another battle. And so why stop us from getting the judgment that we're definitely entitled to? The one thing that is certain right now is that if we don't get this judgment, we're not going to be eligible to get to market on day one. That is the one certainty that we have. You can't bring his, you can't do this under civilian suit at the FDA until the FDA does something, right? Correct. There has to be an act. So what's the FDA act? It's going to be granting them tentative approval. So we'll be granted tentative approval. And at that point, they will bring a citizen's petition, most likely, or an action in the District of D.C. to try to enjoin the FDA from approving us. That's going to be the next phase of this litigation because there is so much at stake, which frankly just proves the point of why we should go forward here. That there are adverse interests. This is really significant. And we need to get this judgment and move forward. That's what we're asking for here. Are there no further questions? Thank you very much.